And there was no basis in the record for the trial court's ultimate finding of $240,000. The trial court had two figures in front of it. Mr. Merkles, that was Ms. Yale's expert, of some $343,000, which the trial court ruled was substantially overvalued. And then my client's, Mr. Moretta's, which was supported by the accountant, Mr. Weinberg, and my client, of $200,000. Now, first of all, with regard to Mr. Merkle, he didn't even give an opinion. He gave an estimate of fair market value. What's the difference between the estimate and the fair market value? As the record discloses, Justice, the difference is fairly significant. I don't mean the amount, but I mean how does one use the net asset value versus the market value? How do you come to that in this sort of program? It's one or the other. There are the two methodologies, one using the cost, et cetera, the asset value, one using the fair market, but the fair market is predicated on comparables, which Mr. Merkle admitted he didn't do because he didn't have time. Did your expert do that? He did not do that. He valued the case. He did even less. He just accepted the figures given to him by Richard. He did as part of the net asset value and supported by the accountant as well. Remember, the accountant looked at all of the checks to determine the cost of goods sold. So he did that. But now you're questioning the estimate value. Yes. And what's really a difference between an estimate value and a fair market value? Because he conceded that he didn't use comparables, which is part of the methodology. It's the same thing as if you had a real estate appraisal and you didn't want to use income and you didn't want to use cost and any of that. You said, well, we're going to use market. Well, what's the market? The market is defined by comparables. He said he didn't do it. The trial court, as I understand, employed the net asset valuation method. You're complaining about what he did, but he used the methodology that you urged him to use. It did, but, well, he was half right. If I may use the right methodology. But he said it's $240,000, and that's part of the problem. I understand, and Mr. London, I'm sure, will tell you, he's already told you, you can value in a range, and I'm familiar with all those cases. But there's no evidence of $240,000. There's evidence of less. There's evidence of $200,000. There's evidence, even from Mr. Merkel, of the gentleman he spoke to, which was one of his bases, who said, I think, $125,000 to $150,000. So you still, when looking at manifest weight, I mean, there has to be something to weigh. And there's no $240,000 basis in the record. That's my position. And further. Well, he's not. The court, as I understand it, you've got two competing experts here. He's not required to accept the opinion, which is what it is, an opinion, the opinion of either one. He's not. Correct? He's not. Absolutely. But when he says, we're going to use this methodology, he has to have some basis for it. I mean, he did essentially disregard Mr. Merkel's, although he makes the statements in there, he excuses them a bit, saying, well, it would take too much time, too much effort to do the comparables. But then, as you indicated, we use our methods. Well, you couldn't go through each one of those items and do it. I'm sorry? You couldn't go through each one of those items and do it. I mean, if I was billing, I'd be billing you hundreds of thousands of dollars if I did that. Well, I don't know. He went through, supposedly, he went through the time to look at all of these. He looked at 1,000 different items. Right. So if he looked at 1,000 different items and, I guess, was paid for that, he could have completed his work. I mean, he himself conceded he didn't finish the job because he says, I can't tell you this is fair market value. It would get thrown out. But then the judge takes and says, I've got both of these, but I don't think this is what anybody would buy it for, and I'm going to put a label on it, what I think it's going to be bought for. Exactly. He used his own way of saying, well, this is a fair profit, but, again, there was no basis for the $240,000. That's what I'm saying. And I'm also saying that Mr. Merkles should have been totally disregarded. He should have been barred based on, number one, the fact that he admitted he didn't use the right methodology. He didn't even give an opinion. And then, secondly, when a gentleman says in his report, I'm a member of the International Society of Appraisers, and that's done, I guess, for a purpose to persuade the court or persuade people that he knows what he's doing, and he admits, well, he's not now because he couldn't afford the payment. I think he should have been thrown out. Merkles' deficiencies, if there were some, really goes to weight. It doesn't go to admissibility. It matters of weight, as with any expert. Justice, I normally do agree with you, and that's the general rule. But as the cases that I've cited point out in terms of whether or not it's competent, there is a degree. There is a line that has to be crossed. And when you specifically, it's the combination of the untruth regarding his qualifications. And then, again, you know, to add to that, he admitted he didn't follow his own methodology. Of course, realistically then, I'm not trying to go against your client, but I'm saying what your opposing counsel has indicated, then the other side should also be tossed out because there's really no basis for most of his because of what they're based on. So then we're throwing them both out then. Well, he can complain about that. I don't think he moved to Barham and he didn't cross appeal or any of those things. And I think that I did address the deficiencies that Your Honor did raise and that Mr. London did, that he did. You can use cost. You can use purchase price. And that was established, and essentially it was uncontroverted. So you have the $240,000 figure. The trial court says we're going to use this methodology, and then they come up with $240,000. It just doesn't add up as far as I'm concerned. Regarding the cash of JCJ, again, it's fairly simple that the original number was $36,000, which admittedly was at the time our expert, Mr. Moretta, did do his report. However, subsequent to that time, it changed substantially, and there was evidence in the record showing the cash was down to about $5,000, and consistent with the practice that the trial court did, which was allowing Mrs. Yale to update the value of her retirement plan because it went down. I believe that the cash amount should have been the more recent 5,300 pursuant to the statute. What do you say to the argument that the judge had to choose a period or a specific time? Well, the judge has to do that, but the statute says you value assets as close to the date as practicable. Now, I understand we're not revaluing the whole business or the inventory or doing that again. I understand there has to be some lag time, but this is the simplest possible computation. Bank account. Why do we ignore what's in the record to be consistent with some sort of time frame when the evidence is a year old? What was Judge Taylor's explanation as to that? I believe that he used Mr. Moretta's report and said, well, we're using net assets. He said it was $36,000, and that was the number. I don't recall. I'm sorry if he specifically referenced the 5,000. See, he was pretty thorough in his finding, 24 pages, as I recall. Yes, he was. He was. And, again, I'm sorry I don't have that on the tip of my tongue, but I believe, you know, consistent with the statute, he should have used the figure of 5,000. It was in the evidence. Regarding the debt of JCJ as well, the judge allowed certain debts at some $85,000 because they were supported by notes. In the others, he said, well, they're not supported by notes, so I'm not going to consider them. Even though there was not only testimony, admittedly not a lot of testimony, but some testimony, and also, more importantly, there were documentations. It's not like there was no documentary evidence of these deposits going in, and they were also reflected in the corporate tax returns, which, if you'll remember, originally were prepared by Mr. Yale's father-in-law. I thought the trial court determined there was no documentation for the amount, what, $125,000 or $135,000? He allowed $85,000. Correct. But he indicated it certainly was not reported on the books of the corporation and could find no notes payable. Right. That's why he did it. He said that. And I'm saying, notwithstanding, notes are not required. They were in the corporate tax returns, and there were wires and deposits set in, and they were explained by testimony. So, again, the court chose to ignore that evidence, which I believe was against the manifest weight and abuse of discretion. Therefore, we maintain the proper value of JCJ was the inventory of $200,000, the cash of $53.25 less the liabilities of $135,000. There's also 6,000 accounts payable in Mr. Moretto's report for a value of $64,325. With respect to my second item, which is the income for Richard Yale. This was fairly well fleshed out in the briefs. But, essentially, there were two components. Of course, there was his trading income. There was his JCJ income. That's set forth in the record. I also made a little chart in the reply brief just so we can follow it a little closer. And, you know, two things. When you look at all of these, the court went back to 2003 to average the trading, which under the Schroeder cases I've indicated is too stale. Five years would have been much more reasonable. Six years has no relationship with what was going on, not only in terms of time, but also when you look at the various figures. He never made anything close to $619,000 any of the subsequent years. In fact, two of the years he had losses. Is this the averaging issue? It's the averaging issue. Which in one he used it and one he didn't. Exactly. Which is what I maintain number one was an abuse of discretion. He should have been consistent. If he's going to average, let's average. But what he did instead, cleverly, was sort of pick and choose. He said, well, we'll average the trading, although he used the six years, which I maintain was. The other business was relatively new, and I think that was a distinction he gave. Well, that is what he said, although notwithstanding that, when you look at all the records, the business actually started in 2000. So you look at the chart. Three years later, he's still losing money. In 2002, he made $7,000. The next year, he lost $18,000. And then, although the trial court characterized, I mean technically you look at it, it's true, then it increased. He says it consistently increased every year except the one year it didn't, which, of course, is a loss. You're talking about the JCJ? JCJ, yes. Well, I think also you've got some problems here about the petitioner taking $10,000 in cash each year for personal expenses. The allegation is that in your closing arguments, which were written, you admitted the figure was more akin to $10,000 to $20,000. It's not reported to the IRS. It's not on his returns. The returns weren't even filed for two years. So how much credence do we attach to this man's testimony? Well, except that the gentleman did come in and testify that he did, in fact, take $10,000 a year. The framer got $50,000 for framing pictures and things? Over the years. Over the years, absolutely. I mean, you know, you have to look at, first of all, there were tax returns for the prior years, which, again, were signed off on by Mrs. Yale's father, and there's no doubt as to those figures, and she's not saying that these aren't real. Now, when you look at these numbers, again, if I could continue on that, 9,000 in 2004, 19,000 in 2005, 43,000 in 2006. So, yes, going up, but not going up in great degree. And then you have the 174,000 in 2007, which the court said, okay, we're going to use that. Well, one problem with that, of course, is that there was evidence, and it was uncontroverted evidence. You had the accountant come in saying that 2007 was artificially high because of the balance sheet adjustments, the problems before. So that was an unusual year. So if you're going to take that, take that with the others as an average. Don't just say, well, this one now, we're going to take that, and we're going to take a cash figure. And, granted, the trial court certainly within his rights to say, well, I don't believe it was 10,000, we're going to say 10%. So, fine, if you accept the 10%, justices, it still doesn't add up to him making $350,000 a year every year for the purpose of support. And that's ultimately where we have the problem. It just doesn't add up. You can play with the figures, as the trial court did, but it's not consistent. You're taking one year, well, why don't we take his one bad year trading?  We're going to ignore the losses on JCJ. Again, I just don't think that it adds up. Mrs. Yale added nothing to the testimony. The trial court did indicate that Mr. Yale had some infirmities with his. There were some inconsistencies, but she didn't really add anything to it. And he did come in. There were other tax returns. There was documentation as to what the gentleman is making. Nothing adds up to an annual figure of $350,000. And the problem is that drives the bus the rest of the way because all his other rulings get to be, well, he makes $350,000 a year, so let's give her 60%. Let's have him pay most of these fees. Let's give her 10 years of support, all these other things. So it's a very important thing. And, again, there's not any evidence per se that he ever made $350,000 in one year. My third point has to do with the dissipation. And this is a $160,000 finding, and I know that the court and the counsel are well familiar with all of the cases. Many of them have been cited in both of the briefs. The first thing the trial court did, though, is make a legal error when saying, well, first of all, the payment of his fees is dissipation, and the old case law was cited, which is the case. But since 1998, as a matter of law, it's not been dissipation. You use it as advances from the marital estate, but you have to do it for both parties. So keep in mind, not only was he paying fees, she was having fees paid, some of them by orders, some of them by agreed orders, and she paid other fees. All of his were counted against him. It's an additional $35,000 in the dissipation claim, and none of them were counted against her, which, again, skewed the asset distribution. Wasn't there an indication that, I mean, with the dissipation, the bottom line was that there was no prejudice to your client in the final dividing up of assets and liabilities, as I understood it? That's what the argument is, because it was an off-balance sheet item. But it was also used to skew everything else. It was used as a factor. It was used to give her the 60%, and it was used to give him all of the debt instead of 60%. Or stated another way, if you're going to give her 60% of the net marital estate, you should give her 60% of the assets, less 60% of the liabilities. Instead, he got 60% of the fee liability. He got all of the other liabilities, including IRS and all these other things, when they were all incurred during the marriage. So the court basically said, well, I'm not going to apply it this way, but I'm going to apply it this way, which is why I've argued that it's just as damaging to him. It's obviously a significant ruling. It seems that the court was somewhat handicapped in determining whether these expenses, these expenditures were truly family expenses. Funds were commingled. Your client freely withdrew cash, as he chose to. And then, as the court characterized it, there was a paper dump of much in the way of checks and other things left for the court to ferret out. Well, as to that, and I laid it out in the brief, you know, this is sort of an unusual case, because most of the dissipation cases are where the fellow comes in and just says, well, I paid bills, and no documentation, no documentation. Well, here we have documentation. Granted, were I the trial counsel, which I was not, I might have had him say some other things in terms of documentation to support the exhibit. I might have had him walk through it and all that. But that doesn't mean that it's not in the record. And you start with a couple of key points, as I've pointed out. Number one, the dissipation date that the court used,  Yeah, I thought you didn't start that until a petition was filed. I'm sorry? I thought that normally it couldn't be considered the dissipation until a petition was filed. That's often the case. I mean, it has to be in the process of breaking down, so you have to look at it factually. But a lot of the cases, they look at separation, they look at the filing. And in this case, it is true. This liquidation happened three months before the divorce was filed, a month before they even separated. And it can't be looked at, justices, in a vacuum. Because this was a fellow, we know his income fluctuated every year. Everybody recognizes that. 2006 was a terrible, terrible year. He made $43,000 with JCJ, which was up until then the best year for JCJ, but he lost $240,000 trading. And that's unrebutted. Nobody said he didn't. So they had this lifestyle, he had to come up with the money somewhere. So clearly, he liquidated these monies, and he paid these things, and yet the trial court says, even the counseling, that's another issue. Remember, in October, they're still going to counseling. So I doubt that as a policy decision I would say that the marriage is irretrievably broken if we're going to counseling. And then on top of that, the court says these checks are dissipation, the very counseling checks, not to mention checks for JCJ, checks for inventory, hockey, which both parties testified the kids played hockey. And Mrs. Yale even paid some money towards hockey. But hockey is dissipation too. These is dissipation. Everything is. And then the court also, very importantly, made the error in terms of not only that date, for the reasons I've told you, but remember we had that bounced check. The court said, well, we're going to use this date for dissipation. And this check was written before, so it can't be. But when you look at the evidence, you see he was doing one thing, then doing another, but the check bounced. So the check actually came in after. And that was to his trading company, which the court had allowed all the other checks. So certainly had the court looked at the proper analysis, there are two checks to that degree. Those add up to, I think, 58,000. So that's half of the dissipation. Remember, the dissipation was 125,000, and then the additional 35,000 fees. So half of the original dissipation is on those two checks, which were NSF checks. The evidence is unrebutted that he lost the money trading. The money had to be repaid. The money was coming from him. The money wasn't coming from her. The trading losses, certainly under the case law, aren't dissipation. Household expenditures are not dissipation. As the cases say, the concept of dissipation is premised upon waste, or as I like to say, upon fault. And there's not enough here to charge the man, particularly when there is documentation. Unlike many dissipation cases, I believe no reasonable person would find dissipation. And, Justices, I will stand on my briefs, respecting the other points, unless the court has any questions for me. Mr. Yale appreciates the time and respectfully prays that this court reverse or vacate the financial portion of the judgment. Thank you. Thank you. Good morning, Your Honors. Good morning. I will address the three areas addressed by counsel, and will stand on my brief as to all of the other issues, unless Your Honors have any questions, and I'll be happy to answer those. Working back in reverse order, starting with dissipation, I think that, Your Honor, Justice Tumen's first question illustrated why any error committed by the court, and I don't think that there was any error, was not reversible error, was not prejudicial. Customarily, standard operating procedure in these divorce cases is where a judge finds that one party or the other has dissipated assets, is to essentially treat that dissipation as a cash advance for the party who has committed the dissipation. So, in this case, the judge found that Mr. Yale had dissipated $159,000. Standard operating procedure would have been to put that on Mr. Yale's side of the ledger and say, okay, he's already received that $159,000, and if we're dividing everything 60-40, we now have to give Mrs. Yale sufficient assets so that she's compensated for that $159,000. What about, though, you know, counsel makes, it left me with questions about the two bounce checks. Where the judge chose his time, it seemed like early, like he went back before he really should have, like they're still going to counseling, and I know there's cases that say that, but it seems like he's just early on where he drew the line. Well, I think a couple of answers to that. First of all, there is not necessarily any bright line. Mr. Reynolds knows that a judgment can be affirmed if it's correct for any reason. Mrs. Yale testified that the marriage had broken down at the very latest as of early 2006, and given that this is a manifest weight case, discretion, those are the standards of review, there is sufficient evidence in this record to support a conclusion that the marriage had either broken down or at the very least, and this is uncontroverted, was undergoing a breakdown as of early 2006 at the latest and even earlier, and since the legal standard to be applied as set forth by the Supreme Court in O'Neill and very recently, within the last year or so, interpreted in the Holthaus case, Holthaus, which is cited in my brief, makes it clear that it's the process of undergoing the breakdown. So all of the checks which the judge considered as being dissipation were within the period of time that the record supports as being within the time frame that the law says is the time frame for dissipation. So I think that's the best answer I can give to Your Honor's question. And interestingly and ironically, relating to the issue of prejudice, when both sides were asked by the judge to give proposed cash-to-balance spreadsheets, and they both did, to take the judge's judgment and translate it into a balance sheet so that the court would be able to enter an order as to how much either party would have to pay in cash to the other to achieve the 60-40 division of the assets that the court had ordered, each party assumed that the $159,000 would be a balance sheet item and Mr. Yale's own proposed cash-to-balance had him paying Debra $65,000. Well, the judge looked at that and said, no, no, no, that's not what I want. I want that off the balance sheet. And the resulting order that the judge entered in April of 2009 was that Mrs. Yale owed Mr. Yale $30,000 to cash-to-balance before attorney's fees. So in essence, there was a $100,000 swing. Had the judge done what judges typically do regarding dissipation, Mrs. Yale would have been $100,000 to the better. In essence, Mr. Yale, it was like he was found to have robbed the bank but was let off with supervision and no restitution. Now, sure, the court considered the issue of dissipation along with a whole myriad of other factors that the court was required to consider under Section 503 in dividing the assets and in allocating the debts, including their income potentials, their health, the duration of the marriage, all of these other factors. And dissipation is just one of the very many factors. And it's clear that the court, the appellant has not shown clearly that the court over-emphasized that factor and that that was the overriding or overwhelming factor. All the other factors that the court considered supported a disproportionate division of the assets in favor of Deborah in this case. And that's not even to say that the court's decision was erroneous. The judge recognized that some of the expenditures made by Mr. Yale may have been for marital purposes. He acknowledged that possibility. However, the court correctly said, under the law, it is not for me as the judge to speculate as to exactly where that money went. Mr. Yale's been charged with dissipation. He has the burden of proving, not by preponderance, but by clear and convincing evidence. And he didn't do that. He dumped a pile of paper on me, and that's all he did. And I think counsel on appeal has done a noble effort to try to do what Mr. Yale and his trial counsel should have done, which is to offer some explanation. But counsel's arguments in his brief is not a substitute for testimony in the trial court. Mr. Yale had the burden at the very least, the very least he had to do, was to take all the checks that he's now pointing to on appeal and say, this is what this was for, and this is what that was for, and to go through them one by one. And counsel and Mr. Yale had the obligation, I think, to give the judge the front cover of the jigsaw puzzle box. It's a clear and convincing burden. Clear and convincing. I mean, that's a very, very high burden, and just giving the judge the pieces of the jigsaw puzzle and saying, look, I'm not going to give you the picture. I'm not going to tell you what it looks like when it's all put together. Some of the pieces may look like they fit together, but maybe they do, maybe they don't. You put them together. And if you don't get it right, I'll tell you what, I'll try plan B. I'll go up to the appellate court and try it a different way. That's not the way cases should be handled. And it's not unfair. It's not unfair to require parties to adhere to their burden of proof and to give the trial judge both the courtesy of explaining why the judge had come to a certain result as well as meeting his or her obligation under the law and burden of proof. And that wasn't done here. So, A, fail to meet the burden of proof, and, B, no harm, no foul. And that's no prejudice. And I think you have to show prejudice on appeal. It has to be clearly prejudiced. You can't just, I think, throw the argument out we were prejudiced. That isn't what was done here. With respect, if there are no other questions, I'd like to briefly address the income issue. Okay. With respect to Mr. Yale's income, a couple of points I think are important. First of all, let's dispatch this argument regarding the trading income real quickly. The trial judge did exactly what Mr. Yale asked him to do with respect to the trading income. Mr. Yale, as noted at page 12 of the judge's judgment, Mr. Yale asked the judge to average six years to determine trading income. The judge did that and came up with $159,000 a year average. What's the problem? You know, be careful what you wish for. That's what he asked for and that's what he got. He didn't argue on reconsideration in the trial court that the judge did something wrong because the judge did exactly what he asked him to do. We're hearing for the first time on appeal that the trial judge shouldn't have done what Mr. Yale asked him to do. So we now have a flip-flop. But what about the inconsistency between the trading and the JCJ? Well, those are apples and oranges. The judge had the right to treat the apple differently from the orange. The judge did exactly what Mr. Yale asked him to do with respect to the trading income. The JCJ was a different animal. And when we look at it, when we look at JCJ, point out a couple of important things. First of all, the judge found, as supported by the corporate tax return, that as well as Mr. Yale's 13.3 financial statement, which I think was in the record as Exhibit 4, that JCJ's income for 2007 was $174,000 and change. There is some argument that that really was an inflated number, it wasn't a real number. However, there's really no clear statement that it wasn't a real number. And in fact, the evidence showed, and Mr. Yale's testimony corroborated, that he took $146,000 in distributions in 2007 and there was $35,000 left in the bank. For that year. Well, you add the two together and you have $181,000, which is consistent with $174,000. We also know, as Justice Tumen asked, that in addition to that, that there was $50,000 in checks written to cash that Mr. Yale took. Now, that was not over the years. That was for 2007, and that's what the record says. So there's $50,000 that he says he used it to pay the framer. And it was $2,000 a job no matter what the job was. If it was for one frame, ten frames, whatever, $2,000. Couldn't remember the framer's name, he'd been dealing with them for six years, and the answer as well was a common last name. So there's $50,000 in unaccounted for payments, which could have been added to dissipation because there's $50,000 in cash, which also further supports dissipation. His counsel in opening statement said he takes $10,000 to $20,000 a year. At trial he said $10,000 a year in unreported cash. And I think it's not unreasonable to assume, as the trial judge did, that if he was admitting to $10,000 to $20,000 between him and his counsel, the truth was probably somewhere north of there. He also testified that he paid personal expenses from his JCJ account. Then, a few questions later, he denied that he did that, and then he denied that he even said that. And this was all within the span of a few pages. So that's what the judge was dealing with. He also testified, Mr. Yale, that he deposited JCJ receipts into his personal checking account, or one of his personal accounts. So we can't even tell from this record how much, to what extent he underreported his income from JCJ. There were hundreds of thousands of dollars being deposited into his personal accounts and commingled from one account to the other, and there's no way to know exactly how much north of $174,000 he actually earned. Now, that was 2007. The case finished in 2008, December. Throughout that entire 2008, Mr. Yale was repeatedly asked, well, what did you earn for 2008? What are you earning? What are you earning? He did admit that he earned $200,000 from JCJ trading through August, just for the first eight months. So we know that the – and that was north of the average of $159,000, so he's solid on that for 2008. But he wouldn't and couldn't say what he earned for 2008. He was asked, well, who knows that information? He was the only one who knew that information, but he wouldn't give it or he couldn't give it. And there was not a scintilla of evidence that he made any less in 2008 than he did in 2007. So reasonably, the judge did, in weighing the evidence and credibility, said, well, he admits to $174,000 in 2007. He admits to cash. He did all these other things. I'm going to assume that his income was no less than $191,000. I think that was the number from JCJ because he had what he admits to taking plus the cash plus all these other things. I think Mr. Yale got away with murder there, too. We have no idea how much more he's making. And if he's making less, it's really up to him to explain that to the judge, not to come to the appellate court and complain that the judge blew it when that's not what the evidence indicates. So for that reason, I think that it cannot be said that the judge abused his discretion in weighing the credibility of the witnesses, and it cannot be said with too straight a face that the judge's decision on income was against the man who dissuaded the evidence with respect to income. Now, moving along to my final issue regarding the valuation of JCJ, I think the questions, Your Honor's questions pointed out that the $200,000 number with respect to inventory, which is a very important component of the evaluation of JCJ, whether you're using this overall fair market value for the whole business or whether you're using the net cash as Moretta did, because Moretta even under his formula, which the judge used, he used the formula but not all the specific numbers that Moretta used, but he used the formula. The $200,000 number is not really supported by any competent, convincing evidence. The $200,000 number was basically pulled out of thin air by... But how do you take that versus the judge's number and not say the same thing? Well, I'll tell you how. The judge's number is essentially a discount off a solid number, okay? But can you do that? Yeah, he can do that. If you have, for example, there are cases, I cite cases involving real estate where one expert says it's worth, you know, $300,000 and another says it's worth $500,000. So I think he blended it. I think he did a reasonable because there was a method to his, the expression is method to madness, but I'm not going to say it was madness. There was a methodology to it. He basically looked and said and tried to, based on the most reasonable analysis of the evidence, to say that this is the best. I think he concluded that that was the best number. A realistic number. A realistic number. And he said, we have to deduct it for a fair profit because nobody's just going to pay exactly what you can sell it for because there's no profit in that. I'm not sure I agree with that, but that's what the judge found. So if you accept the judge's methodology and the judge has the discretion in analyzing the expert testimony to come up with an approach that is reasonable under all the circumstances. So the best number he had actually was as far as what these items could sell for was between $344,000 and $580,000. $580,000 was actually the retail value and that was based on item by item by item retail values, most of which were assigned by Mr. Yale. I think Mr. Merkel testified that the items had a price tag or retail value and that was his $580,000. But then he determined that that was too high. He figured, well, what could it reasonably sell for? The $344,000 wasn't just what it could sell for out the front door in a store. Mr. Yale testified that he was selling his product in a number of ways. He was selling it at benefits. He was headed at restaurants. He would go to shows. It wasn't just all out the front door at straight retail. And the $344,000 is the number that Merkel, who was the only person in this case, besides Richard, Yale, who knew anything about what the stuff was worth, he was the only person to go through it and say, this is what it could sell for if you took a reasonable amount of time, and it was $343,000 and change. The judge discounted that by $100,000. I think it is more than a fair profit on the $240,000. So if somebody could reasonably sell it for $340,000, the judge gave them like a 40% profit. I think that is a very reasonable decision where a court, an appellate court shouldn't say it was an abuse of discretion. On the other hand, this $200,000 was nothing more than Richard saying that's what it was. That was parroted, P-A-R-O-T-T-E-D, parroted by Mr. Weinberg and was then repeated by Mr. Moretta. What counsel doesn't note is that that was based on a list, which Richard created in May of 2007. It was his own list. And it was not substantiated. Each item was not substantiated by a cost. It is not what the record said. In fact, Mr. Weinberg said he looked and he couldn't nail down the cost for all those things because he had to rely on Richard's testimony for a lot. As Richard said, a lot of it was he paid cash. He would buy items for cash. So that was Richard's own item. And Richard didn't update that list after May of 2007. Now, Mr. Merkel, in February of 2008, went through every single item and listed it. So we don't even know if the items that Richard had said existed in May of 2007 still existed in February of 2008. But we know it existed in February of 2008 only for one reason, because Mr. Merkel did what a professional would do. He listed every single item. There is nothing like that in the record besides his testimony and his work product. So, consequently, I think that what the judge did was he took Mr. Moretta's formula, he took the most solid evidence of inventory that there is, discounted it to a reasonable cost as to what somebody would pay for it, and valued it. And as far as the debts, the fact is that there is no solid evidence of anything other than the $85,000. I don't want to belabor that point. I've covered that in my brief. And as far as the cash, I'll remind the Court. I know it's a point I've emphasized that Mr. Yale had total discretion over the cash. He put it in. He would take it out. He would write checks to cash for $50,000. He did everything he wanted with the cash. So here we are near the end of the trial. His expert has already said, given evaluation, using $36,000 in cash. So now, all of a sudden, there's a certain date he says it's $6,000. Well, where did the rest of the money go? Where was it? Did he have cash somewhere else? Who knows? You could pick any given month, and the cash would be up or down. The cash might be up at the end in January after you've had a big Christmas season. He had a store in Watertower. We don't know. The judgment was entered in April of 2009. I do not think it was unreasonable or an abuse of discretion or against the manifest way to the evidence for the trial judge to use the cash figure that was in the evaluation report that Mr. Yale's own expert used, given all of the other factors in this case dealing with the issue of cash. So for those reasons, as well as all the reasons stated in my brief, we respectfully ask that Your Honor affirm the judgment of the court as being within the court's discretion and not contrary to the manifest way to the evidence. And unless there are any further questions, I'll stop writing my book and I'll sit down. Thank you. Thank you. Briefly, Justices, regarding the dissipation again, I agree that the date is a significant problem for Mrs. Yale, as has been indicated. Now, Mr. London mentions that she testified ultimately that it was broken down sometime very early in 2006. But the question before that, which I think is more telling, and I have that on page 15 of my brief, she was asked when the marriage broke down. And she said, I don't have a specific date. So then when she follows that up with something vague and then it's contrary to evidence that we have, that the parties were still living together, the parties were going to counseling at the time that this liquidation took place, I think that that is a serious problem which undermines the trial court's rulings, all of the rulings with respect to dissipation. Not to mention, which Mr. London didn't address, I don't think, the $35,000 aspect of it having to do with the misreading of the statute regarding what we do with attorney's fees. Now, he ultimately says, you know, burden of proof, which I've talked about. And that's, by the way, Justices, that's why it's very important. Because dissipation, I find to be a very fascinating legal doctrine. I mean, essentially, all a party has to do is say, he dissipated this amount, and then magically a burden shifts to him, a burden of clear and convincing evidence, which we don't see all that often in civil law. It's very interesting. But all the more important, then, let's get it right in terms of the date. I mean, a lot of these cases, again, that we've seen have to do with there's a case on file, the parties are separated, the fellow goes to Vegas, there are no documents. I don't think you've seen anything, or any court of review has seen anything quite like this, where the parties are still living together, parenting together. You saw the joint parenting agreement, going to counseling, doing all these things. And she, by virtue of saying, he dissipated, now he's put on this clear and convincing track. I don't think that's fair. I don't agree, again, with Mr. London saying no harm, no foul, because the court himself, when he's going through all his detail, lists the fact of the dissipation as one of his factors in giving my client all the debt, which I think was over $150,000, probably $159,000 or so. So that's where it was. So it wasn't a balance sheet item, but it was the same thing. He says, well, we'll give him all of his debt. It's the same thing, exactly the same thing, as if he had been charged with dissipation. Regarding the income, I respectfully disagree with counsel as to what are apples and what are oranges. I think we have the same person. It's the same kind of situation where he's up and down. Obviously, one of these jobs isn't enough to support the family, because he's been doing both of these for a number of years. So I think when you split methodologies like this, and particularly in the way that it was done, to get him up to a figure that he's never had in a year, that's problematic. And also, again, and I conceded in the briefs, Mr. London said yes. Mr. Yale asked for this. Well, he asked for part of it. He said whether or not this was misguided or not, whether or not it was supported by the case law, he says, okay, we've got an interesting situation here. What do we do? I said, well, we'll average six years, which was probably counsel's way of being candid, saying, hey, we did have the good year here. Let's put this all in. And had the trial court done that and averaged both sources for six years, we only wouldn't have the problem. But when you average one and then take the one artificially good year, that's where it gets skewed. That's the problem. With respect to the value issue, you know, part of the problem is, and Mr. London laid out how the trial court went about coming up with this value, but ultimately, to me it looks more like, although he's giving lip service to my client's experts saying we're going to do it this way, you look at it and ultimately say, well, Mr. Moret's number is high, but let's base it on this. In other words, we're going to do fair markets and discount it for something else. But, again, that's using the cart before the horse because it's a valuation methodology that doesn't exist. So, again, when you're using an estimate, and then this is nothing more than the trial court's estimate. Regarding the cash, by the way, just the last thing, and I did look while Mr. London was talking at the judgment. As a matter of fact, the court did not go into any detail in terms of determining the $36,000 figure. He used that, which obviously was from Mr. Moretter's report, which we don't dispute. The point is, just as I made before, we have something much more practicable. Discretion or not, the court is supposed to value property as close to the date of trial as practicable, which I submit was not done with the cash figure. Thank you. Thank you. We'll take it under advisement.